IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-867-JLK

BIOMEDICAL DEVICE CONSULTANTS &
LABORATORIES OF COLORADO, LLC,

      Plaintiff,

v.

VIVITRO LABS INC.,

      Defendant.

---

**DEFENDANT VIVITRO'S OPPOSITION TO BDC'S MOTION FOR PRELIMINARY
INJUNCTION [ECF NO. 8]**
████████████████

---

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................ 4

II.  FACTUAL BACKGROUND ........................................................................... 6

   A. The Parties and the Industry ...................................................................... 6

   B. The Lack of Inventiveness in the '935 Patent .......................................... 8

III. ARGUMENT ................................................................................................. 10

   A. Substantial questions of infringement and validity prevent the Court from entering a preliminary injunction. ..................................................... 11

      1. Legal standards specific to likelihood of success on the merits ................................. 11

      2. ViVitro's Product does not infringe the '935 patent. .................................................. 12

         a. The "Excess Volume Area" limitation requires both (1) a structure and (2) fluid communication between that structure and the other claim elements. ................ 12

         b. The Accused Product does not include an excess volume area in fluid communication with the return chamber............................................................. 15

      3. The '935 patent is likely invalid, and at a minimum is vulnerable to validity challenges.............................................................................................................. 19

         a. Overview of Dynatak M6 Manual (Exhibit 5).................................................... 20

         b. Overview of Xi (Exhibit 3) .................................................................................. 22

         c. Claims 1, 2, 8 and 13 of the '935 patent are anticipated by the Dynatek M6 Tester ...................................................................................................................... 24

         d. The asserted claims are obvious over Dynatek in view of Xi............................... 27

   B. There is no clear showing of immediate and irreparable injury caused by the alleged infringement................................................................................................................ 30

      1. There is no evidence that patented features drive demand. ......................................... 30

      2. BDC's assertion that it will lose market share is based on speculation and conclusory statements....................................................................................................................... 33

      3. Even if BDC had shown a likelihood of harm, it has not proved that such harm is irreparable. ......................................................................................................................... 35

      4. BDC has not shown a sufficient connection between the alleged reputational harm and the alleged infringement....................................................................................................... 39

      5. BDC's vague reference to "functionally related products" is insufficient to support a finding of irreparable harm. ........................................................................................... 41

IV.  CONCLUSION............................................................................................... 50

   CERTIFICATE OF SERVICE ...................................................................... 51

INDEX OF EXHIBITS ................................................................................................................. 52

████████████████████████████

Plaintiff Biomedical Device Consultants & Laboratories of Colorado, LLC ("BDC") fails to establish that this case warrants the extraordinary remedy of preliminary injunctive relief. Defendant ViVitro Labs Inc. ("ViVitro") asks the Court to deny BDC's motion, ECF No. 8 ("Motion").

## I.       INTRODUCTION

A review of the relevant factors shows that BDC's motion should be denied. First, BDC has not shown a likelihood of success on the merits, as there are substantial questions on both questions of infringement and validity. Regarding infringement, the accused ViVitro product lacks the "excess volume area" in "fluid communication with the fluid return chamber" as also required by the '935 patent. Second, there are equally if not more substantial questions about the validity patent. BDC does not claim to have invented the accelerated heart valve tester. Rather, BDC contends that the "excess volume area" element is the inventive feature that distinguishes its patent and tester from prior accelerated testers. But as Dr. Dasi, ViVitro's expert and head of the Cardiovascular Fluid Mechanics Laboratory at Georgia Tech explains, such "excess volume areas" were well-known and understood for years before the effective date of the patent.

More particularly, looking at the '935 patent claims as a whole, there are substantial questions about whether the asserted claims are invalid as anticipated or obvious in light of two prior art publications in this very field. The two references contain every element of the asserted claims, and there are ample motivations for combining the teachings of such references. Thus, BDC cannot show a likelihood of success on the merits. This factor alone warrants denying BDC's motion.

████████████████████████████

BDC also cannot show a likelihood of substantial and immediate irreparable injury. First, BDC has presented no competent evidence that patented features will drive the demand for the accused product to establish the requisite causal nexus between the alleged potential sales-based harm and the alleged infringement. Although BDC claims that its current product, the VDT-3600i, is successful due to its "excess volume area" feature, there is no factual evidence that is the case. And since demand for BDC's own product is not driven by any patented feature, there is no reason to believe any patented features would drive demand for the Accused Product, either. Second, BDC's argument that it will suffer a loss of market share is insufficient to establish irreparable harm on its own and is supported only by conclusory, speculative statements—falling well short of the required evidentiary showing. Its purported fear of reputational harm is similarly speculative and not tied to the alleged infringement. But even more, BDC's actions in licensing the patent to another competitor after making similar claims of irreparable harm—████████████████████████—demonstrates that the alleged harms would be quantifiable and compensable with monetary damages. Lastly, BDC's vague assertions that it will lose sales of unidentified "related" products does not advance the ball for them. For these and other reasons, BDC's claim of irreparable harm falls short and is another independent basis to deny BDC's motion.

Finally, the final two factors, the balancing of the potential harms and the public interest, also weigh in favor of denying BDC's motion. An injunction prohibiting ViVitro from rolling out its new product, which the evidence shows incorporates new technologies and improvements having nothing to do with the asserted patent, would severely harm ViVitro and hinder the

continued advancement of the testing and thus development of lifesaving medical devices. For all of these reasons, BDC's motion should be denied.

## II.     FACTUAL BACKGROUND

### A.     The Parties and the Industry

ViVitro is a leading test equipment and a contract testing services company specializing in providing engineering solutions to cardiovascular medical device manufacturers and research organizations around the world. Its mission is to help bring safe, effective cardiovascular devices to market quickly. ViVitro's instruments and engineering solutions are the most widely cited equipment in academic and research publications. **Exhibit 1**, Declaration of Karim Mouneimné ("Mouneimné Decl.") ¶ 5. Even the former CEO and current CTO of BDC admits ViVitro is "well-known in the market for heart valve testing" with "a reputation for innovation." ECF No. 8-1 ("Weinberg Decl.") ¶¶ 27, 29. ViVitro's latest innovation is the subject of this lawsuit and motion for preliminary injunction.

Artificial heart valves are tested to industry standards using heart valve test fixtures. **Exhibit 2**, Declaration of Lakshmi Dasi ("Dasi Decl.") ¶¶ 31–32. These test fixtures generally include a motor, one or more test chambers where the valve is positioned, and a loop of tubing that re-circulates a test fluid that flows through the valve. *Id.* ¶ 32. The re-circulating test fluid causes the valve being tested to open and close repeatedly, simulating the flow of blood in the heart. *Id.* ¶ 25. Because an artificial heart valve is expected to last for years inside a patient, there is a clear benefit to being able to perform testing at higher ("accelerated") speeds, expressed in "cycles per minute," than the valves would operate in the human body. **Exhibit 4**, Lu et al. (2003) Research Article ("Lu"), at 185. Where an ordinary heart beats around 60–100 beats per

████████████████████████

minute, an accelerated tester can operate at 200, or even 2,000 cycles per minute. Dasi Decl. ¶¶ 61, 66. Months of accelerated testing can represent years of real-world use, allowing designers to more quickly validate and test designs. Lu at 186.

ViVitro's forthcoming Heart Valve Durability Tester with Automatic Dual Control Technology (the "ADC Tester") is the result of a research and development ("R&D") effort that began around 2020. Mouneimné Decl. ¶ 20. The ADC Tester incorporates new features not provided by, and solves issues with, BDC's market-leading VDT-3600i product. *Id.* ¶¶ 22–28. BDC, wanting to put a stop to ViVitro's innovation and competition in the market, now accuses the ADC Tester of infringing BDC's U.S. Patent No. 9,237,935 ('935 patent (ECF No. 1-1)).

BDC claims ViVitro's device is a "copycat" of the VDT-3600i product it asserts is covered by the '935 patent. *E.g.*, Motion at 18; Weinberg Decl. ¶ 23. That is false, but it's also irrelevant. What *is* relevant is that no one would mistake the ADC Tester as a "copy" of the *asserted patent*. If anything, the device shown in the asserted patent more closely resembles ViVitro's "HiCycle" tester, which dates back to the 1990s. For example, the asserted patent and the HiCycle tester both include one "central drive motor" for testing multiple samples arranged in a circle about the motor—a feature that neither ViVitro's ADC Tester nor BDC's VDT-3600i have adopted, as shown below:



| ViVitro's HiCycle | '935 Patent Fig. 2A |
|---|---|
| BDC's VDT-3600i | ViVitro's ADC Tester |

## B.     The Lack of Inventiveness in the '935 Patent

BDC contends it "revolutionized the market" by incorporating an "excess volume area on the outflow side of the [heart] valve" being tested. Motion at 4. That is not true.

"Accelerated" testers have been known since at least the 1990's. Dasi Decl. ¶¶ 37-38. Since accelerated testing has clear benefits to the important field of heart valve design, extensive research has been done on accelerated testers. A known problem in the field is that, under accelerated testing, there can be unnatural pressure shocks in the system that can cause the valve to fail in ways that it would not fail inside an actual patient. *Id.* ¶ 33. These pressure shocks can cause a valve to fail an artificial test ("in vitro"), when it would not fail inside a real patient ("in

vivo"). Lu at 186 ("the valve is less durable in accelerated testing than *in vivo*"). These failures are undesirable because they cause designers and manufacturers to reject good valves due to faulty test condition. *Id.* at 186–87.

The pressure shocks that can occur in an accelerated tester are sometimes called "water hammer." *Id.* at 188 (describing how "the water hammer effect due to reversed fluid flow increases downstream pressure"). Water hammer can occur in *any* fluid system where there is a sudden change in pressure. Dasi Decl. ¶ 21. For more than a century, plumbers in all different fields of fluid mechanics have solved these pressure shocks by adding excess volumes filled with air to fluid systems. *Id.* ¶ 21, n.4. For example, a patent issued in 1902 describes "an improvement in air chambers for pumps" to "assure an even flow of water, and … obviate the recoil of the water in the pump-pipe at each stroke." **Exhibit 6**, Sponseller et al. Patent, lines 9–19.[1]

Moreover, designers of accelerated heart valve durability test systems were aware of techniques to avoid pressure shocks in fluid systems and applied them in that field long before the 2009 filing date of the '935 patent. In general, compliance in the field of the patent is the ability of a fluid filled system to absorb pressure changes. Dasi Decl. ¶ 27; '935 patent, 9:11–14. By the 1990s, accelerated test systems that used air chambers as excess volume area to absorb pressure changes were on sale commercially and described in research articles and patents. Dasi Decl. ¶¶ 26, 33–36. Moreover, by the late 1990s, the mathematical relationship between excess

---

[1] Such devices are sold to this day as "water hammer arresters" in hardware stores and described as such in other patents. Dasi Decl. ¶¶ 21, 23.

volume and pressure was well-known. *Id.* And designers published articles on how to use those principles to design test chambers for heart valves and other devices in accelerated test systems. *Id*; Lu at 187 (noting the "water hammer effect can be reduced with a built-in compliance" and citing multiple articles discussing effect of compliance on valve wear and testing). Other prior art expressly disclosed accelerated heart valve testers that likewise included "excess volume areas" as in the '935 patent. These include the Chinese patent publication CN 1035153C to Xi and a 1993 Dynatek M6 product manual, discussed in Section III.A.3 below. In short, the idea or use of a "compliance chamber" or an "excess volume area" to control pressure spikes was not new.[2]

## III.    ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Therefore, a district court should enter a preliminary injunction only "upon a *clear showing* that the plaintiff is entitled to such relief." *Id.* at 22 (emphasis added). To obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits, (2) he is likely to suffer irreparable harm without an injunction, which harm (3) outweighs any harm to the non-moving party, and (4) an injunction is in the public interest. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

---

[2] Mr. Mouneimné attributes the steady adoption of the VDT-3600i to its "single drive motor" architecture—where an independent motor is provided for each test sample—other commercial factors, rather than anything to do with the "excess volume area" as BDC contends. Mouneimné Decl. ¶¶ 13–14, 16.

███████████████████████

**A.    Substantial questions of infringement and validity prevent the Court from entering a preliminary injunction.**

**1.    Legal standards specific to likelihood of success on the merits**

An accused infringer can preclude a finding that the patentee is likely to prevail if it raises a "substantial question" regarding *either* infringement or validity of the patent. *Trebro Mfg. v. FireFly Equip.*, LLC, 748 F.3d 1159, 1165 (Fed. Cir. 2014).

To show a "likelihood of success on the merits" of *infringement*, a plaintiff must prove it is "more likely than not" that the accused product contains "each and every limitation" of claims, as properly construed. *Id.* at 1166; *Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190, 1203 (Fed. Cir. 2017). If an accused infringer does not infringe an independent claim, then he cannot infringe claims that are dependent on that independent claim. *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).

As to the defense of *invalidity*, the burden on an accused infringer at the preliminary injunction stage to show a "substantial question of invalidity … is lower than what is required to prove invalidity at trial. *Vulnerability* is the issue at the preliminary injunction stage …." *Tinnus Enterprises, LLC*, 846 F.3d at 1205 (citations and internal quotation marks omitted) (emphasis added). Once an alleged infringer "come[s] forward with evidence of invalidity," the patentee must then "rebut" that evidence and persuade the Court the invalidity defense "lacks substantial merit" *Id.*; *Titan Tire Corp.*, 566 F.3d at 1379.[3]

---

[3] BDC essentially ignore the evidence of invalidity in its motion, arguing ViVitro "presented no such evidence." But ViVitro gave both the Dynatek and Lu prior art references discussed below

████████████████████

### 2.    ViVitro's Product does not infringe the '935 patent.

ViVitro's Accused Product does not infringe the '935 patent because it does not include an "an excess volume area capable of operating at the accelerated pulsed rate … in fluid communication with the fluid return chamber" recited in claim 1. *See* Dasi Decl. ¶¶ 88–89, 91. Instead, the Accused Product absorbs pressure using a series of plastic, "annular compliance rings" placed into the outflow and inflow chambers. So they do not provide an area for fluid to move into as described and claimed in the '935 patent.

### a.    *The "Excess Volume Area" limitation requires both (1) a structure and (2) fluid communication between that structure and the other claim elements.*

The "excess volume area" claim element is interpreted in the "context of the entire patent" as understood by a person of "ordinary skill in the art … as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). A person of skill in the art would understand that the "excess volume area" must be both an area that is distinct from the return chamber, and "in fluid communication" with the return chamber.

First, the term "excess volume area" must refer to a defined structure in the device. Claim 1 recites the "excess volume area … provid[es] a volume for storing a volume of a test system fluid," in addition to the fluid that is in the return chamber. The '935 patent further describes how "test system fluid is stored in an excess volume area" during a driving or compression stroke.

---

to BDC in January. BDC's empty suggestion these are "clearly different and unrelated" to the '935 patent (Motion at 8) is refuted by the analysis below.

███████████████████████

'935 patent, 3:15–18; *see also id.* at 12:15–16 ("The compliance chambers … provide excess volume area for fluid to move into when the piston … performs a compression stroke.")

Figures 3 and 6 of the '935 patent both illustrate the "excess volume area" as "compliance chambers" that define "cavities" in the device. '935 patent, 9:10–11; Figures 3, 6. The compliance chamber has three closed sides, and one open side connecting it to the volume of the return chamber. BDC argued to the United States Patent and Trademark Office ("USPTO"), in defending the validity of a related patent claiming the same excess volume area,[4] that the referenced "'excess volume' is fluid in excess to that contained in the channel," while "an 'excess volume *area*' is a *place* to store it." **Exhibit 7**, BDC Patent Owner Preliminary Response in IPR2018-00498, at 32.[5] This is consistent with the way the "excess volume area" is illustrated in Figures 3 and 6:

---

[4] BDC's statements in this related proceeding can be considered for claim construction because they can "inform how the inventor understood the invention" and "clarify[]scope of a claim." *Sequoia Tech., LLC v. Dell, Inc.*, No. 2021-2263, 2023 WL 2903684, at *7 (Fed. Cir. Apr. 12, 2023). And identical terms in related patents have the same construed meaning. *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003).

[5] BDC provided its own colorized version of Figure 3 in that Preliminary Response, where it characterized the entire fluid pathway of "green, blue and orange sections combined" as the "channel," and the "volume of the excess fluid (i.e., in addition to that already in *the channel*) is displaced into compliance chambers 135 (in yellow). *Id.* at 10–11 (emphasis added); *see also id.* at 12 (similarly colorized Fig. 6).



| **'935 Patent FIG. 3** | **'935 Patent FIG. 6** |

The conclusion that the excess volume area is a defined structure in addition to the return chamber is also supported by the rule that patent claims are interpreted to "give effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (collecting cases). Thus, because the excess volume area receives fluid "in excess of" fluid in the return chamber, the excess volume area cannot be the *same* structure as the return chamber—they must be distinct.

Second, fluid must be able to flow from a point *outside* the "excess volume area" to a point *inside* the "excess volume area" (or vice versa). This is required by the claim 1 requiring that the "excess volume area" is "in fluid communication with" the return chamber (for the purpose of "storing a volume of test system fluid"). The '935 patent describes the "compliance chambers 135 provide *excess volume area* for fluid to move into when the piston 114 performs a compression stroke" and claim 1 recites that the excess volume area is "for storing a volume of a test system fluid." '935 patent, 12:4–6, 17:48–49. This is consistent with the '935 patent figures, which show that the "excess volume area" provided by the compliance chambers has an opening for fluid to flow from the "excess volume area" to the return chamber.

███████████████████████████

The '935 patent's description of "fluid communication" is also consistent with the understanding of a person of ordinary skill in the art that the term "fluid communication" means that fluid must be able to move from a point inside one volume to a point inside another volume. Dasi Decl. ¶ 105. The '935 patent further teaches that the "compliance chamber" (i.e. excess volume area) can include an "access port" to "provid[e] *additional* air or gas pressurization" showing that the chamber is gas-filled to absorb pressure spikes by absorbing excess fluid. '935 patent, 9:57–61. In contrast, if a chamber is full of fluid, with no "excess volume," then that chamber cannot absorb pressure shocks from the "compression stroke" because no more fluid can move into that volume. Dasi Decl. ¶¶ 19, 94. BDC also argued in its IPR Preliminary Response that a structure that absorbs pressure changes by "material deformation" is *not* an "excess volume area," further supporting the conclusion that excess volume area must absorb the pressure changes by storing excess test system fluid flowing from the system. Exhibit 7, at 37, 47. Thus, claim 1's "fluid communication" limitation requires that fluid must be able to flow from outside the excess volume area to inside the excess volume area to absorb pressure spikes.

> **b.** *The Accused Product does not include an excess volume area in fluid communication with the return chamber.*

The Accused Product does not include an "excess volume area … in fluid communication with the fluid return chamber" as claimed by the '935 patent. BDC alleges the excess volume area is "the volume adjacent to the annular compliance ring." Motion at 10; ECF No. 8-2 ("Girard Decl.") at 12. As shown below, the '935 patent illustrates an "excess volume area" as a cavity formed in the return chamber. But the outflow chamber of the Accused Product (what BDC alleges is a "return chamber") is a single chamber that does not include any structure

defining an "excess volume area." A comparison of a cross section of the Accused Product and

the '935 patent's compliance chamber 135 providing an "excess volume area" is below.

**Annotated Cross Sections of ViVitro's Accused Product (left)[6] vs.
the '935 Patent Figure 3 (right)**



The Accused Product includes closed "annular compliance rings" to provide compliance

to the system. The "annular compliance rings" are closed structures that do not exchange any

fluid or gas with the outflow chamber of the Accused Product. Mouneimné Decl. ¶ 25. Since the

"annular compliance rings" are closed structures, the area inside the "annular compliance rings"

is not "in fluid communication" with the return chamber as required by claim 1. *Id.*; Dasi Decl.

---

[6] See **Exhibit 8**, Engineering Drawings of ViVitro's Accelerated Durability Tester, at
VIVITRO_000002.

¶ 105. And the "area adjacent to" the compliance rings is simply the outflow chamber itself—there is no distinct or defined structure "adjacent to" the rings. Consequently, BDC points to the outflow chamber in the Accused Product as allegedly being *both* the "excess volume area" and the "return chamber" elements required by the '935 patent.

**Girard Declaration p. 10 (excerpt)**     **Girard Decl. p. 11 (excerpt)**

     

But as described in Section III.A.2.a above, the "excess volume area" must define a structure that is separate from the return chamber. BDC's claim that the outflow chamber of the Accused Product is both the "excess volume area" and "fluid return chamber" renders one of those terms superfluous, which violates the basic principle of claim construction that claims should not be interpreted to make elements superfluous. *See, e.g.*, *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1340 (Fed. Cir. 2016); *Bicon, Inc.*, 441 F.3d at 950 (collecting cases).

███████████████████████████

Moreover, the "area adjacent to" the annular compliance ring cannot provide the compliance function or prevent pressure shocks, which BDC claims is the improvement and purpose of the excess volume area in the '935 patent. Weinberg Decl. ¶ 7. The outflow chamber of the Accused Product is filled with liquid so that no air remains. Mouneimné Decl. ¶ 25. Excess air in the outflow chamber can cause unpredictable effects during testing, so the Accused Product is designed to be "de-bubbled" to remove even trace amounts of air from the outflow chamber. *Id.* The red "De-bubble Port," illustrated in the cross section of the Accused Device (above) is used to ensure the outflow chamber is completely full of fluid by "de-bubbling" the device. **Exhibit 8**, at VIVITRO_000004 (labeling the "De-bubble Port"); Dasi Decl. ¶ 93. Since the outflow chamber is full of fluid, there is no "excess volume area" that can absorb pressure shocks. Dasi Decl. ¶ 94. Thus, for at least these reasons, the Accused Device does not infringe claim 1 because it lacks the "excess volume area" "in fluid communication with the fluid return chamber" as recited in claim 1.

Since claim 1 is not infringed, the asserted dependent claims 1, 2, 3, 4, 8, 9 12, and 13 are also not infringed. *Wahpeton Canvas Co.*, 870 F.2d at 1552 n.9 ("One who does not infringe an independent claim cannot infringe a claim dependent on … that claim.").[7] Thus, BDC cannot show a prima facie case of infringement based on any claim of the '935 patent, and is not likely to succeed on the merits of any of its infringement claims against ViVitro. At minimum, BDC has not made the requisite "clear showing" of infringement, and ViVitro has raised a substantial

---

[7] ViVitro's positions are necessarily preliminary at this stage, so ViVitro reserves the right to assert other noninfringement positions at a later date.

question of infringement regarding the lack of the excess volume area element. This failure alone prevents the grant of a preliminary injunction.

### 3. The '935 patent is likely invalid, and at a minimum is vulnerable to validity challenges.

Patents can be invalid over the prior art as either anticipated or obvious. A claim is anticipated where "each and every [limitation] is found within a single prior art reference." *Biogen MA Inc. v. EMD Serono, Inc.*, 976 F.3d 1326, 1331 (Fed. Cir. 2020). Even if not anticipated, a patent can be invalid as obvious if "the differences between the [claimed invention] and the prior art are such that the [claimed invention] as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103; *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 399 (2007).[8]

BDC cannot show that it is likely to succeed on the merits because all the asserted claims are invalid as either anticipated or obvious over the prior art. Simply put, the "excess volume area" that BDC claims as its innovation here is simply a routine component of accelerated heart valve test systems that were well known before the priority date of the '935 patent. At a minimum, the prior art shows that the '935 patent is "vulnerable" to validity attacks, which bars the injunctive relief sought by BDC. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1359 (Fed. Cir. 2001).

---

[8] Obviousness is a question of law based on four "basic factual inquiries": "the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966).

BDC claims that its "excess volume area" or "compliance chamber" is novel (*see, e.g.*, Weinberg Decl. ¶¶ 7–8), but this is incorrect. Accelerated testers in the prior art included compliance to address the problem of pressure shocks, long before the '935 patent priority date. Lu at 186 ("All [of the most common] accelerated testers [in 2003] … have adjustable resistance, compliance, amplitude, and cycle rate"). The use of "excess volume" or "compliance chamber" to provide compliance is also routine in accelerated testers because those general concepts had been known for more than a century to prevent pressure shocks in systems with a pump. *See, e.g.*, Lu at 191 ("Each loop consists of two resistor units and two compliance chambers"); Dasi Decl. ¶ 22. Two pieces of prior art (along with others) disclose accelerated testers with "excess volume areas" or "compliance chambers," and a person of skill in the art would recognize that every feature of the '935 patent is disclosed or taught by these two prior art references. Dasi Decl. ¶ 53, 73.

### a. *Overview of Dynatak M6 Manual (Exhibit 5)*

First, the Dynatek M6 is a heart valve accelerated durability testing device that was on sale since at least 1993. *See* Weinberg Decl. ¶ 25 (admitting Dynatek's system "predates" BDC's patent). **Exhibit 5** to this Response is a prior art user manual for the Dynatek M6, published in 1993 ("Dynatek"). An annotated figure from Dynatek shows that it includes an "excess volume area"—described as a "capacitance tank"—as well as all the routine features of the prior art testers. Figure 1 from Dynatek is annotated below, illustrating how Dynatek discloses each element of claim 1.

**Annotated Dynatek Fig. 1A.**



Dynatek also discloses that the capacitance tank can exert a spring force by the gas in the tank acting as a "buffer" for pressure changes (claim 8), that the chambers can have sensor ports to insert transducers (claim 13) and a fluid displacement member (swashplate) driven by the motor (claim 2). Dasi Decl. ¶¶ 58, 69, 72; Dynatek at 4, 13, and 15. During operation of the Dynatek M6, fluid can flow through the tygon tube in and out of the capacitance tank. Dynatek at 15; Dasi Decl. ¶ 67. As the Dynatek M6 operates, the pressure in the test chamber increases and decreases as the bellows compress to generate pressure changes across the valves. Dynatek at 19. The air in the capacitance can buffer these sudden pressure changes in the system by expanding and contracting (like a spring) because the air is compressible and can change volume

(unlike the test fluid). Dynatek at 15; Dasi Decl. ¶¶ 21, 58. Thus Dynatek's "capacitance tank" performs the same function as the "compliance chamber" as described and claimed in the '935 patent. Dasi Decl. ¶¶ 70-71. Thus, Dynatek anticipates at least claims 1, 2, 8, and 13 of the '935 patent.

### b.    *Overview of Xi (Exhibit 3)*

Second, Xi is another prior art publication that discloses another accelerated tester.

**Exhibit 3**, Xi et al. Patent, ("Xi") at 5 ("[T]he present invention invents a prosthetic heart valve fatigue life test device. Its prominent point is that the load experienced after the prosthetic heart valve is accelerated is similar to the physiological conditions …."). Xi discloses an "air chamber" (element 11) that is placed downstream of the device being tested, where "liquid flows from the test chamber into the air chamber" during operation. Xi at 8. The air chamber provides compliance for the accelerated heart valve tester. Dasi Decl. ¶¶ 48-49; Lu at 191 (describing the air chamber of Xi as providing adjustable "compliance"). Although BDC characterizes its purported innovation as positioning the "excess volume area" on the outflow side of the valve being tested,[9] Xi shows that was a known configuration. Dasi Decl. ¶ 47; *see also* Lu at 191. An annotated view of Xi's FIG. 4 is shown below.

---

[9] Claim 1 does not recite where the "excess volume area" is positioned, only claims 9 and 12 of the '935 patent define the "excess volume area" as a "compliance chamber defining a cavity in the return chamber."



Dasi Decl. ¶ 47.

Similarly, Xi discloses that linear motors and cyclic/acyclic drive waveforms were known in the art of accelerated testing. Dasi Decl. ¶ 78; Xi at 1. Thus, Xi discloses all the features of claims 3, 4, 9, and 12 in an analogous accelerated testing system for heart valves. At the time of the '935 patent's Priority Date, combining these features would have been no more than an obvious (and unpatentable) "predictable variation" on the prior art, in light of the level of skill in the art at the time. *KSR*, 550 U.S. at 417 (2007); Dasi. Decl. ¶¶ 76, 85, 86.

In sum, Dynatek and Xi both disclosed the use of "excess volume areas" to prevent pressure spikes in accelerated testers a decade before the '935 patent was filed. As set out below,

the asserted dependent claims of the '935 patent are merely obvious combinations of Dynatek and Xi. Thus, BDC was incorrect to argue to the Patent Office (and this Court) that this is a novel feature. The '935 patent is invalid.

The below sections steps through the claims element-by-element, showing that every element of every Asserted Claims is either (A) disclosed by Dynatek; or (B) would be an obvious modification to Dynatek based on Xi.

c.      *Claims 1, 2, 8 and 13 of the '935 patent are anticipated by the Dynatek M6 Tester*

First, Dynatek's motor and swashplate drive fluid cyclically using bellows, at rates of up to 1000-2000 cpm. Dasi Decl. ¶ 61. Thus, Dynatek discloses "a pressure source configured to drive a test system fluid cyclically within the device above a normal physiological rate, at an accelerated pulsed rate of greater than 200 beats per minute within the device" as recited in claim 1. *Id.* An annotated excerpt of Dynatek is shown below, illustrating the pressure source in Dynatek's accelerated tester:

### Dynatek FIG. 1A excerpt, annotated:



███████████████████████

Second, Dynatek discloses a "pressurizable test chamber for containing the test system fluid." Dasi Decl. ¶ 62. Dynatek both instructs the user to "pressurize the system" and that the system has an "operating pressure" of up to 5 psi. *Id.*

Third, Dynatek discloses "a fluid distribution chamber positioned on a first side of the valved prosthetic device and in fluid communication with the pressure source" as recited in claim 1. Dasi Decl. ¶ 63. Dynatek calls the "fluid distribution chamber" an "upper head." *Id.* Dynatek's "upper head" contains the "inlet flow passages" of the valves being tested, and therefore is on a "first side" of the valved prosthetic device. Dynatek at 14; Dasi Decl. ¶ 63. Dynatek's "upper head" is also in fluid communication with the pressure source (Dynatek's bellows, motor, and swashplate) because Dynatek discloses that "bellows compression" causes fluid to flow "through the throttle valve and into the central reservoir where it is then available to the upper head above the valves for another cycle." Dynatek at 1; Dasi Decl. ¶ 63.

Fourth, Dynatek discloses "a fluid return chamber positioned on a second side of the valved prosthetic device." Dasi Decl. ¶ 64. Dynatek refers to the fluid return chamber as a "lower head" and discloses that the "lower head is ported from the valve discharge region." Thus the "lower head" is on the opposite side of the valve being tested as claimed in the '935 patent.

Fifth, Dynatek discloses a "fluid return conduit both structurally and fluidly connecting the fluid distribution chamber to the fluid return chamber." Dasi Decl. ¶ 65. Dynatek discloses a "center return reservoir" (also referred to as the "central reservoir") that makes fluid "available to the upper head above the valves for another cycle." Dynatek at 1.

Sixth, and finally, Dynatek discloses the "an excess volume area" of claim 1. This claim element has three sub-parts, each disclosed by Dynatek. First, Dynatek discloses a "capacitance

tank," which is an "excess volume area" because the tank is not full of fluid (and therefore provides "excess" volume to the closed fluid system). Dasi Decl. ¶ 66. Next, Dynatek discloses that the "capacitance tank" is connected to the system using a Tygon tube. Thus, the "capacitance tank" is "in fluid communication" with the test chamber. Dasi Decl. ¶ 67. Finally, the capacitance tank is "capable of operating at the accelerated pulsed rate," because Dynatek discloses that the capacitance tank is "used to buffer small variations in the systemic pressure," and the Dynatek system operates at an accelerated rate. Dasi Decl. ¶ 66.

Claims 8 and 13 likewise are anticipated by Dynatek. Dynatek discloses that the capacitance tank shown in Dynatek FIG. 1A contains air (a compressible gas) above a waterline and that the capacitance tank provides a "buffer small variations in the systemic pressure." Dasi Decl. ¶ 70. The "buffer" refers to a "spring force" exerted in response to a change in the systemic pressure. Dasi Decl. ¶ 71. Thus, Dynatek discloses the feature of claim 8, that the "excess volume area" contains a compressible gas that can provide a "spring force." Dasi Decl. ¶¶ 70–71.

Claim 13 is also anticipated by Dynatek. As described above, the Dynatek device discloses an "upper head" and a "lower head" on opposite sides of the valves being tested. Dynatek discloses "pressure transducer ports are provided in the upper and lower heads." The pressure transducers disclosed by Dynatek are sensors that give an "indication of pressure" or "pressure measurement." Dynatek at 19. In other words, the "pressure transducer" is a sensor. Dasi Decl. ¶ 72. Thus, Dynatek also discloses that the device includes "a first port" and a "second port" located on opposite sides of the device being tested, where both ports are configured to receive a sensor. *Id.*

In sum, asserted claims 1, 2, 8, and 13 are anticipated by Dynatek and invalid.

     **d.**    *The asserted claims are obvious over Dynatek in view of Xi.*

To whatever extent they are not disclosed by Dynatek, the asserted claims are merely obvious modifications to Dynatek and therefore all asserted claims are invalid as obvious. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007) ("If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability). Xi is another prior art reference that discloses an accelerated heart valve tester with an excess volume area. Xi at 1, Xi, Fig. 4. When "a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious." *KSR*, 550 U.S. at 401.

To start, if BDC were to show that any element of claims 1, 2, 8, and 13 was not expressly disclosed in Dynatek, the differences between them would either be obvious "common sense" variations of Dynatek, or obvious in view of Dynatek and Xi. Dasi Decl. ¶¶ 73, 74; *KSR*, 550 U.S. at 402. For example, BDC might argue that the "excess volume area" must be directly connected to the return chamber. But Xi discloses an "air chamber" that is directly connected to the return chamber, and it would be obvious to combine Xi's air chamber with Dynatek's return chamber, since Xi teaches the benefits of providing an air chamber connected to the return chamber. Dasi Decl. ¶ 74. Other variations on Dynatek are also obvious for a similar reason— there are a finite number of predictable ways that a compliance chamber can be connected to a system that that has a fluid return chamber, fluid distribution chamber, and fluid return conduit. *KSR*, 550 U.S. at 422 ("When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.").

██████████████████████████

Claims 3, 4, 9 and 12 are also obvious over Dynatak and Xi. Claim 3 recites that the "drive motor is configured to operate cyclically, acyclically, or a combination of both, to provide cyclic and acyclic fluid pressures within the test chamber." Since a drive is either cyclic or not cyclic (acyclic), any drive motor satisfies the limitations of claim 3. Dasi Decl. ¶ 79. Even if this were not true, Xi expressly discloses that the drive motor in Xi's accelerated tester can be driven "using an arbitrary waveform generator (9)." Xi at 2. Since an arbitrary waveform is either cyclic or acyclic, Xi discloses a drive motor that can be cyclic, acyclic, or both, as recited in claim 3. Dasi Decl. ¶ 78. Moreover, Xi's teaching that the "drive waveform" can be adjusted to change the "load experienced by the heart valve" would motivate a person of skill in the art to combine Xi's arbitrary waveform input with Dynatek's drive motor to "provide cyclic and acyclic fluid pressures within the test chamber." Dasi Decl. ¶ 78. Thus it would be obvious to configure the Dynatek drive motor to operate either cyclically or acyclically, or both. Dasi Decl. ¶ 78.

Claim 4 recites that the motor is "a linear motor." Xi discloses that the accelerated tester "main body portion consists of a linear motor." Xi at 1; Dasi Decl. ¶ 80. Dynatek uses a rotating motor and swashplate to move the bellows back and forth, so a person of skill in the art would understand that they could substitute a linear motor for the rotating motor and swashplate to perform the same function of moving the bellows back and forth. Dasi Decl. ¶ 80. Therefore claim 3 is an obvious substitution of known elements and not patentable.

Claim 9 and claim 12 are also obvious in view of Xi. Dasi Decl. ¶¶ 81–85. Claim 9 recites that "the excess volume area comprises a compliance chamber defining a cavity within the fluid return chamber" and claim 12 further clarifies that the "compliance chamber provides a volume for holding a gas … and allows the test system fluid in the test chamber to occupy a

portion of the volume." Xi expressly discloses a "return chamber" and "a compliance chamber defining a cavity within the fluid return chamber." Dasi Decl. ¶ 83. The below annotation from the Dasi Dec shows Xi's return chamber and compliance chamber that forms a cavity:

**Xi. FIG. 4 annotated:**



Xi expressly teaches that a person of skill in the art can adjust "*compliance* and impedance of the circulation loop system, change the flow rate through the valve and the *trans-valve pressure differential*, and select the appropriate drive waveform to drive the linear motor to move according to a certain waveform, frequency, and amplitude so that the opening and closing motion of the heart valve is close to the physiological conditions." Xi at 7 (emphasis added); Dasi Decl. ¶¶ 84–85. Thus, it would have been obvious to one of skill in the art to replace Dynatek's capacitance tank with Xi's "air chamber" (i.e., a compliance chamber). Dasi Decl. ¶

85. Again, the substitution of a "capacitance tank" with a "compliance chamber" would have been obvious to one of skill in the art in light of the express disclosures and teachings of Dynatek and Xi.

In sum, both Dynatek and Xi disclose or teach every element of the asserted claims and various combinations of them would require no more than "simple substitution" of prior art elements that a person of skill in the art would recognize as obvious. *KSR*, 550 U.S. at 417. At the very least, they raise substantial questions as to the validity of the claims, even at this preliminary phase. BDC therefore cannot show a likelihood of success on the merits.

### B.      There is no clear showing of immediate and irreparable injury caused by the alleged infringement.

BDC must also "make a clear showing that it is at risk of irreparable harm, which entails showing a likelihood of substantial and immediate irreparable injury." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) [hereinafter *Apple II*]. In patent infringement suits, a patentee seeking a preliminary injunction must establish that (1) absent an injunction, it will suffer irreparable harm, and (2) a sufficiently strong causal nexus relates the alleged harm to the alleged infringement. *Id.* Irreparable harm cannot be presumed from a mere showing of likelihood of success on the merits. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393–94 (2006).

### 1.      There is no evidence that patented features drive demand.

BDC has failed to establish a causal nexus between any sales-based harms and the alleged infringement because BDC has not demonstrated that any patented features of the '935 patent affect consumer demand for the Accused Product. The Federal Circuit has imposed a "causal nexus" requirement that informs "whether the patentee's allegations of irreparable harm

are pertinent to the injunctive relief analysis, or whether the patentee seeks to leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant." *Apple II*, 695 F.3d at 1374–75. Absent evidence establishing a causal nexus, a plaintiff "cannot establish a likelihood of irreparable harm necessary for a preliminary injunction." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1327 (Fed. Cir. 2012) [hereinafter *Apple I*]. While the causal nexus requirement does not require a patentee to show the patented features are the *exclusive* reason customers buy a product, the patentee must present evidence that the patented features "impact customers' purchasing decisions." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 641–42 (Fed. Cir. 2015) [hereinafter *Apple IV*] (noting that it "may well lessen the weight of any alleged irreparable harm" if the infringing features "are not the only cause" of the sales lost by plaintiff).

A plaintiff might meet the causal nexus requirement by introducing evidence that the inclusion of a patented feature makes an accused product "significantly" more desirable. *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 735 F.3d 1352, 1364 (Fed. Cir. 2013) [hereinafter *Apple III*]. Or "survey evidence showing that the infringer's customers would be willing to pay a 'price premium' for a product with the claimed features" could also show the required "connection between the patented feature and demand for the accused products." *Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-CV-00033-JRG, 2018 WL 11357619, at *2 (E.D. Tex. Mar. 22, 2018) (quoting *Apple III*, 735 F.3d at 1367).

Here, BDC presents no competent factual evidence—no surveys, customer testimonials, or marketing brochures—about what customers in the market demand, much less that any patented features will drive demand for the Accused Product. BDC (and its witnesses) repeatedly

opine that the supposedly novel "excess volume area" is the key feature behind the patent and the success of the VDT-3600i, it does not demonstrate that this feature will drive demand for the *Accused Product*. *See* Motion at 3–4; Weinberg Decl. ¶¶ 6–9; Girard Decl. ¶¶ 14–15.

Nevertheless, ViVitro disputes that the "excess volume area" of the patent drove the success of BDC's VDT-3600i because, as explained above, that feature was not new to accelerated testers at the time. Rather, customers gravitated to the VDT-3600i because it uses Single Drive Motor architecture—a feature *not* covered by the '935 patent. Mouneimné Decl. ¶ 16. Even Dr. Weinberg's declaration suggests that the touted "excess volume area" does not drive demand: he lists several *other* factors that caused consumers to prefer BDC's VDT-3600i product over ViVitro's earlier HiCycle product, including the HiCycle's use of a single motor driving multiple test stations. Weinberg Decl. ¶ 12.[10] And because the "excess volume area" feature does not drive demand for the VDT-3600i, it certainly cannot drive demand for the Accused Product.

Instead, ViVitro's ADC tester, developed to replace its legacy HiCycle product, is designed to meet customer demands not met by the VDT-3600i through new features not covered by the '935 patent. *See* Mouneimné Decl. ¶¶ 20–28. It is these new features that are likely to drive customer demand for the ADC tester. For example, the new tester physically separates each test chamber and uses closed "rings" to provide compliance in the system, rather than a pressurized chamber. *Id.* ¶ 25. And ViVitro's ADC tester has an automatic control system to

---

[10] Dr. Weinberg also claims that six features of ViVitro's ADC tester "mimic" BDC's VDT-3600i product. Weinberg Decl. ¶ 24. But evidence of a defendant copying patented features "does not, by itself, establish a causal nexus." *Apple IV*, 809 F.3d at 643.

provide more precise control without affecting the valve opening. *Id.* ¶ 26. ViVitro has filed

multiple patent applications to protect its own innovations that will be embodied in the new

tester (the Accused Product). *Id.* ¶ 23. ViVitro's proposition to the market is based on these (and

other) features—not on an excess volume area or compliance chamber as in the '935 patent.[11]

BDC's failure to show that the "excess volume area" or any other patented feature drives

demand for the Accused Product, standing alone, warrants denying the motion. *See BoxCast Inc.*

*v. Resi Media LLC*, No. 2:21-CV-00217-JRG, 2022 WL 884261, at *3 & n.10 (E.D. Tex. 2022)

(failure to show nexus "alone dooms" the motion).

### 2.    BDC's assertion that it will lose market share is based on speculation and conclusory statements.

The second flaw with BDC's argument that it will lose market share in the absence of an

injunction is that it relies upon conclusory and speculative statements. For example, BDC asserts

that the loss of market share now will cause it to lose those customers for the foreseeable future.

Motion at 14. Its only evidentiary support for this is its CEO's assertion that customers generally

purchase a pilot testing device and then, if successful, purchase multiple devices from the same

source. *Id.* (citing Weinberg Decl. ¶ 18). But Dr. Weinberg's conclusory declaration alone is

insufficient to establish the alleged facts. *Ball Dynamics Int'l, LLC v. Saunders*, No. 16–cv–

00482–NYW, 2016 WL 7034974, at *8 (D. Colo. Dec. 1, 2016) ("conclusory statements are

insufficient to establish irreparable harm").

---

[11] The cited ViVitro product brochure only mentions the "compliance rings" as one among

eighteen features in a bullet-point list, following promotion of other, primary features. Weinberg

Decl. at 36.

Courts are rightly skeptical of relying on the say-so of the movant's own officer. *See, e.g.*, *Advanced Communication Design, Inc. v. Premier Retail Networks, Inc.*, 46 F. App'x 964, 979 (Fed. Cir. 2002) (vacating preliminary injunction where the only evidence consisted of nothing more than a conclusory assertion by the movant's CEO and conclusory letter by its patent counsel; *TeleSign Corp. v Twilio, Inc.*, No. 2:15-cv-3240 PSG(SSx), 2015 WL 12532491, at *6 (C.D. Cal. Oct. 19, 2015) ("[T]he Court is troubled by Plaintiff's factual evidence, as it consists almost entirely of testimony from Plaintiff's vice president."). They are particularly skeptical of such self-serving statements where no sales figures, market data, or customer surveys are provided. *See, e.g.*, *Tech-Wear, Inc. v. Acme Laundry Prod., Inc.*, 38 F. Supp. 2d 1147, 1152 (C.D. Cal. 1998) (declarations from patentee's president and treasurer with "no sales figures, specific instances, or other evidentiary facts" insufficient to show irreparable harm); *Guntert & Zimmerman Constr, Div,, Inc. v. Gomaco Corp.*, No. 5:20-cv-04007-CJW(KEM), 2020 WL 6948364, at *9 (N.D. Ia. Oct. 14, 2020) (plaintiff's claims "lack[ed] sufficient evidence" where they did not include "projected market data, sales figures, customer surveys, circumstantial evidence, or any other support for [plaintiff's] assertions"). *But see Bushnell, Inc. v. Brunton Co.*, 673 F. Supp. 3d 1241, 1262 (D. Kan. 2009) (finding irreparable harm in part based on statement of executive VP of marketing that market would not allow patentee to raise prices to recoup losses where patentee also *provided data* that it had to cut prices to compete with accused product), *cited in* BDC Motion at 7 n.7.

BDC also argues that the "market is sensitive to disruption" *because* the "customers are few but rewards are large." Motion at 14–15. BDC cites no evidentiary support for this conclusion. On the contrary, the cost and sophistication of consumers in this market (the medical

device testing industry) would tend to show that consumers in the market are less likely to make *any* initial purchases without fully considering the competitive options. *See Elec. Design & Sales, Inc. v. Elec. Data Systems Corp.*, 954 F.2d 713, 718 (Fed. Cir. 1992) (explaining that sophisticated consumers may be expected to exercise greater care and expensive goods are purchased after careful consideration); *see also* Mouneimné Decl. ¶ 34. Indeed, despite introducing the ADC tester to the U.S. market in summer 2022, ViVitro has not obtained any orders for the Accused Product in the United States. Mouneimné Decl. ¶ 31.[12]

Last, even if BDC had sufficiently shown a probable loss in market share, probable loss in market share *alone* cannot amount to irreparable harm. *Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1307 (D. Utah 2008) (citing *Nutrition 21 v. United States*, 930 F.2d 867, 871–72 (Fed. Cir. 1991)). Neither the difficulty of calculating losses in market share, nor speculation that such losses might occur, amounts to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial. *Nutrition 21*, 930 F.2d at 871. "[R]eliance on possible market share loss [alone] would apply in *every* patent case where the patentee practices the invention." *Id.* (emphasis added).

### 3.   Even if BDC had shown a likelihood of harm, it has not proved that such harm is irreparable.

BDC must also show that any harm it will suffer in the absence of preliminary relief is *irreparable*—i.e., the evidence must show that money damages are inadequate to compensate for the alleged infringement. *See Celgard, LLC v. LG Chem, Ltd.*, 624 F. App'x 748, 753–54 (Fed. Cir. 2015); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate

---

[12] Any sales outside of the United States are irrelevant to BDC's U.S. patent rights.

██████████████████████████████████

compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

BDC's ████████████████████████████████ demonstrates that monetary damages would adequately compensate BDC for the alleged infringement here, and any lost sales sufficiently related to such infringement would be easily quantifiable based on BDC's records of sales and pricing. *See Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1343 (Fed. Cir. 2017); *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1558 (Fed. Cir. 1995). In determining whether monetary damages are adequate, a district court should review a patentee's past licensing practices, in addition to exploring "any relevant differences from the current situation[.]" *Apple III*, 735 F.3d at 1370. The analysis should consider: (1) the fact of the grant of previous licenses, (2) the identity of the past licensees, (3) the experience in the market since the licenses were granted, and (4) the identity of the new infringer. *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008).

These factors suggest ████████ would adequately compensate BDC for any infringement. BDC sued TA Instruments ("TAI") in 2017 for infringement of the same patent (among other related patents) and moved for preliminary injunctive relief—raising many of same claims of irreparable harm asserted here. Yet in May 2018, before a hearing was ever held on its motion (shortly after TAI challenged the validity of some of the asserted patents), BDC settled with TAI and ████████████████████████████████████████ ████████████████. *See* **Exhibit 9**, Settlement Agreement and License Between BDC and TA Instruments ("License") §§ 3, 7–8. █████████████████████████████████ ████████████████████████████████████████

██████████████████████████████

ViVitro now stands in a similar position as TAI did, as one of a "limited number competitors" in a "specialized" market accused of infringing BDC's patent at the outset of a new product launch. *Compare* Motion at 4 and 13–15, *with* ECF No. 17 at 9 and 23–26 of 33 (arguing similar bases for irreparable harm). And what was BDC's experience in the market in the five years since then? According to BDC, it has retained a dominant market share: in 2017, it had an "80–90% share of the worldwide market," while today it maintains a "70–75% share of the worldwide market" and "an 80–85% share of the U.S. market." ECF No. 17 at 24 of 33; Weinberg Decl. ¶ 16.[13]

So BDC's professed fears of various irreparable harms apparently did not come true. And there is no credible evidence that the same fears would come true here, if ViVitro is not enjoined. Accordingly, ████████████████████████████████████ strongly supports the conclusion that whatever harm BDC may suffer (if it ever prevails in showing ViVitro infringes a valid patent claim) will be compensable with monetary damages. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1325 (Fed. Cir. 2014) ("As we have held many times, using sufficiently comparable licenses is a generally reliable method of estimating the value of a patent."), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).[14]

---

[13] ViVitro does not agree that BDC's worldwide activities are relevant but provides BDC's numbers here for context.

[14] Dr. Weinberg claims that BDC faces a "far greater risk" from ViVitro than it does from TAI, because of ViVitro's "reputation for innovation." Weinberg Decl. ¶ 29. Whatever fears Dr.

██████████████████████████████████

Furthermore, BDC's own statements provide information for quantifying the alleged harms. For example, BDC provides the number of units sold (under 40 per year), the prices of those units ($75,000 to $85,000), the useful lifespans of those units (10 to 15 years), and the U.S. market share of those units (70–75%). Motion at 4, 14. Indeed, BDC asserts that it is an incumbent in a well-established market and has been selling its patented product for about 13 years. *See* Weinberg Decl. ¶ 9. Thus, any lost market share would be easily calculated based on lost sales relative to BDC's records of pricing and sales over several years. BDC's own statements about the market show its alleged damages are calculable and not "irreparable."

BDC also argues that any potential loss in market share here is irreparable because the market has substantial "incumbency effects." Motion at 13–14. Citing to *Broadcom*, BDC argues that "incumbency effects" result from "markets where customers prefer to remain with an incumbent supplier[.]" *Id.* at 13. However, in *Broadcom*, the Federal Circuit explained that the unique nature of a *design wins* market can create special incumbency effects that cannot be measured or monetarily compensated. *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1336–37 (Fed. Cir. 2013). A design wins market is "fundamentally different" in that a winning supplier's component part is essentially designed into an Original Equipment Manufacturer (OEM) product. *Id.* at 1336. The OEM is locked into using the winning supplier's component part for a time because the component part is necessarily incorporated into units of the OEM product. *Id.* This temporarily immunizes the winning supplier from competition in its sales of the

---

Weinberg may have about ViVitro's innovative products does not transform legitimate competition into irreparable harm, for the purpose of this motion.

███████████████████████

component part to the OEM. *Id.* But the heart valve tester market is not a design wins market, and the immeasurable "incumbency effects" that result from supplying the incumbent component in a design wins market are not at issue here. The heart valve testers at issue in this case are sold as discrete units rather than component parts to be designed into a line of OEM products. Although the life cycle may be long, one sale of a heart valve tester does not immunize the winning provider from competition in succeeding sales. And as noted, BDC's own data about the market allows for any loss to be quantified and remedied by monetary damages.

### 4. BDC has not shown a sufficient connection between the alleged reputational harm and the alleged infringement.

BDC argues that, without the preliminary relief, it will suffer harm to its alleged reputation as an innovator. Motion at 15–16. In support of this proposition, BDC cites to several customer testimonials as supposed evidence of "widespread industry acclaim from customers." *Id.* at 16. But BDC has not shown that *any* of the cited statements (or any others on the cited website) address the VDT-3600i product (much less its patented features) or BDC's "reputation for innovation." *See* Motion at 16. Indeed, the touted "excess volume area" is noticeably absent from the testimonials BDC cites in support of its reputation. Rather, each of the cited testimonials relates to the quality of BDC's testing services and partnership in the R&D process. Because these statements are based on services irrelevant to the patented features of BDC's VDT-3600i product or the asserted claims, or even its reputation for *innovation* generally, BDC has not established any causal nexus for how the alleged infringement would harm such customer opinions. *See Edge-Works Mfg. Co. v. HSG, LLC*, 285 F. Supp. 3d 883, 901–903 (E.D.N.C. 2018) (noting that patentee "must first demonstrate that it has a reputation [as an innovator] that could be subject to damage" as well as irreparable harm and causal nexus).

███████████████████████████████████████

Further, the '935 patent does not give BDC a market monopoly on ISO 5840 accelerated testing, and BDC does not advertise the supposedly novel "compliance chamber" or "excess volume area" on its website for its VDT-3600i tester. *See* **Exhibit 13**, BDC Test Equipment Brochure, at 4. This failure to promote the VDT-3600i based on the patented features suggests that, even if BDC established a reputation based on the VDT-3600i tester, that reputation is not dependent on the '935 patent.

BDC's reliance on *Douglas Dynamics* is also misplaced. In *Douglas Dynamics*, the Federal Circuit explained that, where the patentee had demonstrated an innovator reputation and intentionally refused to license its patents to maintain its market exclusivity, the patentee's innovator reputation could be harmed if its "innovations" were found in competitors' products. *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013). Here, in addition to BDC's failure to establish its "innovator reputation," BDC ███████████████ ██████████. *See generally* License. BDC's assertion that "the *entire value* of BDC's patents is to protect its *exclusive position* in the market" (Motion at 15 (emphasis added)) thus rings hollow because ███████████████████████████████████████████████████ ████████████████████████████████████. Motion at 4 (citing Weinberg Decl. ¶¶ 15, 25).[15]

---

[15] BDC ███████████████████████████████████████ while it simultaneously argued that it must "protect its *exclusive* position in the market" because "[w]ithout that *exclusivity*, [it] will be irreparably harmed." Motion at 15 (emphasis added) (never mentioning the prior lawsuit with TA Instruments or its settlement). The truth was only

████████████████████████████

**5.** **BDC's vague reference to "functionally related products" is insufficient to support a finding of irreparable harm.**

BDC next contends that "incalculable" lost sales of both its VDT-3600i product and "other functionally related products" support a finding of irreparable harm. Motion at 16–17. BDC's argument is both factually and legally unsupported. First, the Federal Circuit has explained that loss of so-called "convoyed" and "derivative sales" are, in fact, a type of harm compensable by damages—either by lost profits or as part of a reasonable royalty calculation. *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008) (citing *Rite–Hite Corp. v. Kelley Co. Inc.*, 56 F.3d 1538, 1550 (Fed. Cir. 1998)); *see also Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984) (holding profits from sale of non-patented eyeglasses displayed on infringing racks were relevant to reasonable royalty determination). But a patentee can only recover lost profits on these unpatented products and services if "both the patented and unpatented products 'together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit.'" *Am. Seating Co.*, 514 F.3d at 1268 (quoting *Rite–Hite*, 56 F.3d at 1550). Moreover, there is no sufficiently "functional relationship" when "independently operating patented and unpatented products are purchased as a package solely because of customer demand." *Id.* BDC asserts that its VDT-3600i product "must be integrated with a novel test system and other functionally related products," and that customers will buy "related products and services," but it offers no competent evidence to support that statement. Motion at 16–17.

---

revealed after the Court ordered BDC to produce ████████████████—over BDC's vehement objections. *See* ECF No. 23 at 3–4.

███████████████████████

Dr. Weinberg's declaration does include one conclusory statement that ViVitro's sales will "adversely affect" sales of "products and services" that are "related" to BDC's VDT-3600i product. Weinberg Decl. ¶ 32. He does not identify the type, nature, quantity, or cost of these "related products and services." Consequently, it is impossible to determine (much less attempt to rebut) how related, if at all, these unpatented "products and services" are to the VDT-3600i product or the '935 patent. As discussed above, BDC's own customer testimonials cited in its motion show that there are products and services BDC provides that have no apparent nexus to the '935 patent. These vague references cannot satisfy BDC's burden to "clearly establish[] that monetary damages could not suffice." *Abbott Lab'ys. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006).

Further, BDC's two cited cases do not help its argument, either. In *Atlanta Attachment*, the Court had already granted summary judgment on the issues of both infringement and validity of the patent in the plaintiff's favor. *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, No. 1:05-CV-1071-ODE, 2007 WL 5011980, at *6 (N.D. Ga. Feb. 23, 2007). And while BDC argues the grant of injunction was because "plaintiff lost convoyed sales," the court did not find plaintiff actually had any convoyed sales, much less lost them, or that this allegation supported the grant of the injunction. *See id.* at *4–8.[16]

---

[16] BDC also omits that the permanent injunction was vacated a year later when the Federal Circuit reversed the district court's grant of summary judgment. *See Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361 (Fed. Cir. 2008) (reversing judgment); *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, No. 1:05-cv-01071-ODE, slip op. (N.D. Ga. Apr. 7, 2008), ECF No. 365 (granting unopposed motion to vacate permanent injunction).

The *Baker Hughes* case had a similar fate: the district court ultimately dissolved the preliminary injunction after the Federal Circuit affirmed the USPTO's finding that the asserted patent claims were invalid. *See Baker Hughes Inc. v. Nalco Co.*, No. 4:09-cv-01885 (S.D. Tex. Apr. 14, 2016), ECF No. 141 (order dissolving preliminary injunction) and ECF No. 140-1 (Federal Circuit judgment affirming PTAB). To whatever extent BDC's cited cases reflect that lost related sales can support a finding of irreparable harm, it is a highly factual inquiry for which BDC has not put forth sufficient evidence.

### A. The balance of hardships favors ViVitro and weighs against a preliminary injunction.

The serious and sudden harm to ViVitro's business following an injunction overshadows and outweighs any potential minor harm to BDC.[17] *See LL&L Innovations, LLC v. Jerry Leigh of California, Inc.*, No. 2:10-CV-829-TC, 2010 WL 3956815, at *10 (D. Utah Oct. 8, 2010) (finding the balance of hardships favored defendants because injunction would disrupt business and halt all manufacturing). On the one hand, BDC estimates its product has an 80–85% market share (Weinberg Decl. ¶ 16), and because the "lifespan of valve durability testing equipment is often ten to fifteen years," it will likely be a "long time before a competitor has the opportunity to usurp the place of an incumbent." Motion at 4–5. On the other hand, BDC argues that absent an

---

[17] ViVitro's showing above that the '935 patent is likely invalid and that BDC has failed to demonstrate irreparable harm means the Court need not consider the remaining factors in denying the injunction. *See T.J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc.*, 821 F.2d 646, 646 (Fed. Cir. 1987) (concluding it "is unnecessary to discuss a balance of hardships or the public interest" when the movant fails to establish either a likelihood of success on the merits or irreparable harm).

████████████████████████████

injection, it has "much to lose" because of the "head-to-head competition" with ViVitro, so that "[e]ven one lost sale" would be a "significant threat." Motion at 17; Weinberg Decl. ¶ 33. These assertions are irreconcilable.

BDC has essentially declared it holds the lion's share of the worldwide and U.S. markets and that there are long sales cycles and that customers typically buy for a long term. If true, then the same "incumbency" effects would *protect* BDC's dominant market position during this litigation, even if ViVitro is *not* enjoined. As discussed in Section III.B.3 above, BDC's dominant market position has not changed significantly since it ████████████████████████████ ████████████████████. Thus, BDC can maintain a dominant market share even with "head-to-head competition," and any potential movement in the market during this litigation is likely to be negligible.

In contrast, an injunction will likely cause ViVitro severe harm if it cannot introduce the Accused Product in the market. *See Rudolph Techs., Inc. v. Camtek Ltd.*, No. CIV. 15-1246 ADM/BRT, 2015 WL 5039295, at *16 (D. Minn. Aug. 26, 2015) (finding the "greater potential harm" would be to the alleged infringer if it was "completely shut out from the United States market"). If ViVitro is prohibited from selling or offering its new product in the U.S., its significant investment in this new product would be in jeopardy, likely costing ViVitro ████ ████████ in lost R&D expenses and ███████████ in pre-launch costs. Mouneimné Decl. ¶ 32. Moreover, if ViVitro cannot continue its forthcoming launch of the Accused Product, its reputation as a reliable, innovative supplier in heart valve development would be seriously harmed—leading to a complete disruption of its business and costing ViVitro severe harm. *Id.* ¶¶ 32–35. While BDC discounts the impact an injunction will have on ViVitro's reputation

███████████████████████████

(Motion at 17), BDC admits that ViVitro is "a company with a reputation for innovation." Weinberg Decl. ¶ 29.

Further, ViVitro's ADC tester will bring additional features to the market that have no relationship to the asserted patent. Mouneimné Decl. ¶ 23–28. In sum, the harm to ViVitro from barring it from offering its broad feature set outweighs the harm to BDC for alleged infringement of its patent directed to a narrow set of features in the product.

**B.      A preliminary injunction is contrary to the public interest because slowing the testing and development of lifesaving heart valves will harm the public health.**

First, if this Court finds there is no likelihood of success on the merits, then "the public interest is best served by denying the preliminary injunction." *Abbott Lab'ys*, 452 F.3d at 1348. But even if a likelihood of success on the merits is found, a preliminary injunction remains contrary to the public interest because the proposed injunction would enforce a potentially invalid patent and slow development of potentially lifesaving medical devices.

BDC generally gestures to the policies behind the Patent Act to argue the public interest is in its favor. Motion at 18. While there is a public interest in the enforcement of *valid* patent rights, *Abbott Laboratories*, 452 F.3d at 1348, the court must also analyze "whether there exists some *critical* public interest that would be injured by the grant of preliminary relief." *Hybritech Inc. v. Abbotts Lab'ys*, 849 F.2d 1446, 1458 (Fed. Cir. 1988) (emphasis added). Here, the public's interest in the development of better testing for new potentially lifesaving medical devices tilts the balance in ViVitro's favor, even assuming BDC's patent is valid.

The Food and Drug Administration ("FDA") protects "the public health by ensuring the safety, efficacy, and security of … medical devices," including prosthetic heart valves.[18] To validate the safety and effectiveness of prosthetic heart valves, they must be tested using equipment such as the Accused Product.[19] ViVitro's ADC tester serves the public by bringing "safer, more effective cardiovascular devices to market faster," while meeting regulatory expectations. Mouneimné Decl. ¶ 5. ViVitro is the only dedicated cardiovascular testing group with two ISO 17025 accredited laboratories, and can deliver "reliable, repeatable, and scalable engineering solutions (equipment and contract testing) to medical device manufacturers around the world." *Id.* ¶ 9. Put simply, the Accused Product is a critical new step in the pathway of prosthetic heart valve development and FDA submission.

The Federal Circuit has found a strong public interest in the availability of medical devices and as such, has "refused to permanently enjoin activities that would injure the public health." *See Cordis Corp. v. Boston Scientific Corp.*, 99 F. App'x 928, 935–36 (Fed. Cir 2004); *Cordis Corp. v. Medtronic, Inc.*, 835 F.2d 859, 864 (Fed. Cir. 1987) (granting injunctive relief while a declaratory judgment was pending, in part because the patent system "would not lose its integrity" and because the "[licensee's] continuing ability to produce pacemaker leads was an issue of public interest"). Medical device manufacturers depend on such systems to ensure new

---

[18] *See* https://www.fda.gov/about-fda/what-we-do#:~:text=FDA%20is%20responsible%20for%20advancing%20the%20public%20health,and%20foods%20to%20maintain%20and%20improve%20their%20health.

[19] The FDA and other regulatory agencies outline the test requirements for valved prostheses. **Exhibit 10**, Office Action Response Dated June 17, 2015, at ¶ 10 on page 15 of 15.

prosthetic heart valves satisfy FDA regulations—which allows the heart valves to be used in necessary cardiovascular cases. The public may be deprived of beneficial prosthetic heart valve technology because an injunction would slow the development and release of new heart valve testing machines. *Cf. Apple IV*, 809 F.3d at 647 (weighing the public interest factor in favor of the patent owner because the public would not be deprived of the infringer's products, and the technology at issue dealt with cellphones and tablets and not "lifesaving drugs," and the injunction was limited to the infringer removing the patented features without "disrupting customer use").

Moreover, eliminating ViVitro's Accused Product from the market further reduces competition in an industry that only has a handful of players. An injunction that impedes business competition in an industry that is designed to serve the public is not "in accordance with public policy." *See Mountain Med. Equip., Inc. v. Healthdyne, Inc.*, 582 F. Supp. 846, 850 (D. Colo. 1984) (declining to enjoin a former employee from soliciting or executing orders with Mountain Medical's customers because Mountain Medical is in a dominant market position, with about 50% of the oxygen concentrator market, and an injunction could prevent the prices from declining).

Although BDC and ViVitro are in competition, the differences in each heart valve testing system explain why the public's interest in access to the Accused Product weighs strongly against a preliminary injunction. *See Baxalta Inc. v. Genentech, Inc.*, No. CV 17-509-TBD, 2018 WL 3742610, at *12 (D. Del. Aug. 7, 2018) (denying the preliminary injunction because the accused product "has unique medical benefits not available from [the patentee's] competing products").

███████████████████████████████████

Entering an injunction would prevent manufacturers of heart valves from applying this cutting-edge technology in the testing and development of new prosthetic heart valves. Thus, the public's interest in allowing the Accused Product to proceed to launch outweighs the public interest in protecting patent rights (which, in this case, are likely invalid patent rights).

### C. If the Court grants an injunction, BDC should be required to pay a significant bond.

Rule 65(c) provides that no injunction shall issue without the movant providing security that will properly compensate "any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). BDC should be required to post at least a $1,000,000 bond for the pendency of the litigation because a lesser amount would not allow for proper compensation should ViVitro be found to have been wrongfully enjoined.

ViVitro bears the burden of establishing the necessary bond amount "to secure against the wrongful issuance of the injunction." *Elite Licensing, Inc. v. Thomas Plastics, Inc.*, 250 F. Supp. 2d 372, 391 (S.D.N.Y. 2003). The court then has wide discretion when setting the bond amount and can consider evidence that demonstrates ViVitro's "potential lost profits, lost market share and associated costs of relaunch." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1385 (Fed. Cir. 2006).

As discussed above, if ViVitro is enjoined from selling the Accused Product for the pendency of the litigation (at minimum, 2 years), ViVitro would lose the opportunity to create sales and build or deepen its customer relationships in the small medical device testing industry, and ViVitro will also lose an investment worth ███████████████, in addition to ████████ in pre-launch costs. Mouneimné Decl. ¶¶ 32–36. Accordingly, BDC's bond must be sufficient to

███████████████████████████

address the irreparable harm that would be caused by a wrongful injunction. BDC's proposed bond—a mere $10,000—is unsupported.

In fact, BDC's own brief shows why a significant bond is required. BDC claims that an injunction is necessary because (1) the test equipment at issue here has a long useful life; and (2) manufacturers can profit from the sales of related products and services during that long useful life. Motion at 16–17. To the extent this Court were to find those arguments persuasive enough to grant a preliminary injunction, then these same arguments mean ViVitro will suffer the same kinds of irreparable and incalculable harms that BDC alleges it will suffer—an injunction will leave a long-lasting negative effect, seriously disrupting ViVitro's entire business. Mouneimné Decl. ¶ 36.

Considering the substantial costs associated with ViVitro's product launch and subsequent relaunch (Mouneimné Decl. ¶ 32), in conjunction with the significant expenses associated with developing the ADC Tester and the harm to ViVitro's business and reputation, ViVitro would lose ████████ in the event of a wrongful injunction—this figure does not include the costs associated with disrupting ViVitro's business, as those are difficult to measure. *Id.* ¶¶ 32–36. If the Court would prefer ViVitro to calculate potential lost profits, the number is still near $1,000,000. Assuming that ViVitro were to achieve one-fourth of the U.S. market that BDC claims using BDC's highest price (Weinberg Decl. ¶ 16; Motion at 14), plus additional revenue from services and related products, ViVitro would yield almost $1,000,000 per year. This figure does not include the owed compensation for ViVitro's reputational damage. And, in a multi-year litigation, total revenue loss from a wrongful injunction could easily exceed $2,000,000. Taking both calculations into account, BDC's proposed $10,000 bond is completely

inadequate and unsubstantiated. Thus, the Court should set the bond for at least $2,000,000 to secure against the likely harms to ViVitro from a wrongful injunction.

## IV.    CONCLUSION

Because of the deficiencies identified above, BDC cannot carry its burden to show that the extraordinary remedy of preliminary injunctive relief should be granted. The Court should deny BDC's motion for preliminary injunction.

Dated: May 16, 2023.                                    Respectfully submitted,

_/s/ Warren J. Thomas_

Warren J. Thomas
John W. Harbin
MEUNIER CARLIN & CURFMAN LLC
999 Peachtree Street NE, Suite 1300
Atlanta, GA 30309
Telephone: (404) 645-7700
Email: wthomas@mcciplaw.com
            jharbin@mcciplaw.com

Carolyn J. Fairless
Jacob A. Rey
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Telephone: (303) 244-1800
Email: fairless@wtotrial.com
            rey@wtotrial.com

_Attorneys for Defendant ViVitro Labs Inc._

████████████████████████

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 16, 2023, I electronically filed the foregoing **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/Warren J. Thomas*

████████████████████████████████

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Declaration of Karim Mouneimné in Support of Opposition to Motion for Preliminary Injunction, dated May 16, 2023 (HIGHLY CONFIDENTIAL, RESTRICTED – Level 1) |
| 2 | Declaration of Lakshmi Prasad Dasi in Support of Opposition to Motion for Preliminary Injunction, dated May 16, 2023 |
| 3 | Xi et al. Patent (Certified English Translation with Original Chinese) |
| 4 | Lu et al. (2003), Accelerated Fatigue Testing of Prosthetic Heart Valves |
| 5 | Dynatek M6 Manual (1993) |
| 6 | Sponseller et al. Patent, Air Chamber Pumps |
| 7 | BDC's Patent Owner Preliminary Response, *Waters Technologies Corporation v. Biomedical Device Consultants & Laboratories*, No. IPR2018-00498, Paper 5 |
| 8 | Drawings of ViVitro Accelerated Durability Tester, VIVITRO_00001–04 (HIGHLY CONFIDENTIAL, RESTRICTED – Level 1) |
| 9 | May 2018 Settlement Agreement and License between BDC and TA Instruments – Waters, LLC, BDC_00001–05 (HIGHLY CONFIDENTIAL, RESTRICTED – Level 1) |
| 10 | Office Action Response Dated June 17, 2015 in U.S. Application 14/523104, with Declaration of Craig Weinberg |
| 11 | Rousseau et al. (1984), Design of a System for the Accelerated Loading of Heart Valve Prostheses |
| 12 | Curriculum Vitae of Lakshmi Prasad Dasi |
| 13 | BDC Test Equipment Brochure, available at https://www.bdclabs.com/wp-content/uploads/2021/08/BDC-Labs-Test-Equipment.pdf |